1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3           HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4    UNITED STATES OF AMERICA,          )
                                        )
5                                       )
                                        )
6                        Plaintiff,     )
                                        )
7                                       )
                                        )
8           Vs.                         )   No. CR08-767-PSG
                                        )
9                                       )
                                        )
10   KENIA MUNGUIA,                     )
                                        )
11                                      )
                                        )
12                       Defendant.     )
                                        )
13   _____   )

14

15

16            REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    JURY TRIAL, DAY 3

18                  LOS ANGELES, CALIFORNIA

19               THURSDAY, OCTOBER 1, 2009

20

21

22              MIRIAM V. BAIRD, CSR 11893
            OFFICIAL U.S. DISTRICT COURT REPORTER
23             255 East Temple Street, # 181-K
               LOS ANGELES, CALIFORNIA 90012
24                    (213) 894-2853
                   MVB11893@AOL.COM
25

1                          **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**
     **UNITED STATES OF AMERICA:**        U.S. DEPARTMENT OF JUSTICE
4                                         U.S. ATTORNEY'S OFFICE
                                          BY:  JENNIFER WILLIAMS
5                                              – AND –
                                               BRIAN MICHAELS
6                                         312 NORTH SPRING STREET
                                          12TH FLOOR
7                                         LOS ANGELES, CALIFORNIA 90012

8

9

10   **IN BEHALF OF THE DEFENDANT,**      ROBBIN SCROGGIE
     **KENIA MUNGUIA:**                   865 SOUTH FIGUEROA STREET
11                                        LOS ANGELES, CA 90017

12

13

14   SPANISH LANGUAGE INTERPRETERS:

15   ELIZAR CARRASCO

16   MONICA DESIDERO

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                                    INDEX

2    WITNESS:                                                    PAGE:

3
       Kenia Mungia, Defendant, sworn                              8
4      DIRECT EXAMINATION                                          8
       CROSS-EXAMINATION                                          30
5      GOVERNMENT'S CLOSING ARGUMENT                              **63**
       DEFENSE CLOSING ARGUMENT                                   **74**
6      JERRY MELENDEZ, BALIFF, sworn                              92

7                              * * * * *

8

     EXHIBITS:
9

10                             * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 1, 2009; 0900

 2                              ---

 3        THE COURT:  Before we bring the jurors out, I just

 4   wanted to briefly discuss the jury instructions.  There's one

 5   disputed instruction with regard to -- the title being

 6   reasonable cause to believe.  Mr. Scroggie, my tentative

 7   ruling would be to accept the Government's proposed

 8   instruction.

 9        Anything you'd like to add for the record?

10        MR. SCROGGIE:  Yes, very briefly, Your Honor.

11        THE COURT:  Go ahead.

12        MR. SCROGGIE:  I would respectfully submit that

13   under the Coward case that preceded Johan, I believe it was

14   -- the holding of those cases, of course, is that a similar

15   jury instruction was okay.  But in both cases and the case

16   that they rely upon, which I believe is in the Tenth Circuit,

17   go on to discuss why it's probably okay and use language that

18   shows that it's not just a reasonable person off the street

19   standard, it's someone in the position of the defendant.

20        And I understand that that's dicta, but I also

21   believe that it helps to explain where the Court's coming

22   from and what the law really is.

23        So I'll respectfully submit that it would be a more

24   accurate depiction of the law to include the instruction that

25   I've modified slightly to follow that reasoning of those
```

1    Court opinions.

2            THE COURT:  And, Ms. Williams, if the instruction,

3    if it's given, where do you propose that it be inserted?

4            MS. WILLIAMS:  Well, it was originally Instruction

5    23, which I believe is right after the instruction on

6    knowingly.

7            THE COURT:  Okay.  The sequence has changed, I

8    think, because of the preliminary instructions, so that would

9    now be after 35?  At least in the recent annotation?

10           Let me back up by saying this:  We'll --the most

11   amended annotation that I received, you added the preliminary

12   instructions which bumped all of the instructions over, so

13   what I would propose to do is with regard to the amended

14   annotation, I'm going start -- we're going to number it

15   No. 1, but I'm going to start at No. 15, duties of the jury,

16   to find facts and follow the law, which is 3.1, and then the

17   instructions would proceed after that.

18           So you're saying then that your proposed disputed

19   instruction would follow the definition of knowingly?

20           MS. WILLIAMS:  I'm sorry, Your Honor, the

21   definition of knowingly, immediately after that definition is

22   an instruction again on knowingly, about the intent of a

23   person --

24           THE COURT:  Right.

25           MS. WILLIAMS:  -- the knowledge of that person.

1          And this instruction I would propose follow that

2     instruction.

3          MR. SCROGGIE:  One more thing.  I believe there are

4     two -- there are two instructions on knowingly under the

5     heading of responsibility, and perhaps, it kind of slipped by

6     me, but I don't know that we need both of them.  I think one

7     came from the O'Malley, Grenig and Lee, and then one came

8     from the Ninth Circuit Model Instruction.  The packet I has

9     those as 34 and 35, but I would respectfully submit we only

10    need one of those, and I wouldn't be too concerned about

11    which one.

12         THE COURT:  I may not be following you,

13    Mr. Scroggie.  The proposed -- on the amended annotated, what

14    is right now joint proposed 34, which is labeled on Page 36,

15    and that is labeled "Possession," are you saying that is the

16    duplicative of the instruction on Page 37?

17         MR. SCROGGIE:  Yes, Your Honor, and 38.

18    Duplicative of 38.

19         THE COURT:  I think 34 just is a very standard

20    instruction on the concept of possession, not necessarily

21    knowledge.

22         MR. SCROGGIE:  They do use different language,

23    Your Honor, but I think it's two different sources of jury

24    instructions trying to say the same thing and I just didn't

25    want to --

1         THE COURT:  Give me one second.

2         I think they're different.  Again, when I read

3    proposed 34, it talks about how somebody possess something.

4    It's the definition of possession.

5         And 35 basically says, in layman's terms --

6    layperson's terms, that you don't have to know that what

7    you're doing is illegal.

8         And then 36 is simply saying, well, it's difficult

9    to prove what is in somebody's head, and these are the way we

10   prove it.  I think they're different.

11        Okay, let me just take a break.  I'll give the

12   disputed instruction.  I just want to take a break so I have

13   my staff working on the final version and then I'll come out

14   in about five minutes.

15        MR. SCROGGIE:  So you know, Your Honor, we're

16   hoping to put Ms. Mungia as the next witness in order.

17        THE COURT:  Well, I'll come out first, we'll put

18   Ms. Mungia on the stand and then we'll bring out the jurors.

19        MR. SCROGGIE:  All right, thank you.

20          (Recess from 9:15 a.m. to 9:21 a.m.)

21        THE COURT:  If Ms. Mungia would take the witness

22   stand.

23        Let's go ahead and bring in the jury panel.

24        (Open court - jury present).

25        THE COURT:  Defense's next witness?

UNITED STATES DISTRICT COURT

```
1              MR. SCROGGIE:  Yes, Your Honor.  The defense calls
2    Kenia Mungia.
3              THE CLERK:  Please raise your right hand.
4                   Kenia Mungia, Defendant, sworn
5              THE CLERK:  Ma'am, for the record, can you please
6    state your full name and spell your last name.
7              THE WITNESS:  Kenia Mungia.
8              THE INTERPRETER:  Interpreter spelling, Your Honor?
9              THE COURT:  Please.
10             THE INTERPRETER:  M-U-N-G-I-A.
11             THE COURT:  You may inquire.
12             MR. SCROGGIE:  Thank you, Your Honor.
13                        DIRECT EXAMINATION
14   BY MR. SCROGGIE:
15   Q.   Ms. Mungia, how old are you?
16   A.   Twenty-three.
17   Q.   And have you always lived in the United States?
18   A.   No.
19   Q.   Where were you born?
20   A.   In El Salvador.
21   Q.   How old were you when you came to the United States?
22   A.   Twelve or 13.  I don't remember now.
23   Q.   Okay.  Are you a legal resident of the United States?
24   A.   Yes.
25   Q.   Okay.  How far did you go through school?
```

```
 1   A.   Up to ninth.  I finished ninth.

 2   Q.   You finished the ninth grade?

 3   A.   Yes.

 4   Q.   Okay.  And what grade were you in when you came to the

 5   United States?

 6   A.   Seventh grade.

 7   Q.   Okay.  And how many years did it take you to proceed

 8   from the seventh grade through the ninth grade?

 9   A.   Up to ninth grade, four years.

10   Q.   How did you do in school here?

11   A.   I had problems.  It was difficult for me due to the

12   language.

13   Q.   And then what did you do after the ninth grade?

14   A.   I dropped out of school.

15   Q.   You speak some English; correct?

16   A.   Yes.

17   Q.   Okay.  But you primarily speak Spanish; correct?

18   A.   Yes.

19   Q.   Did you ask to testify through an interpreter in this

20   case because you're more comfortable in the Spanish language?

21   A.   Yes.

22   Q.   So then how old were you when you dropped out of school?

23   A.   Seventeen.

24   Q.   And what have you been doing since you dropped out of

25   school at the age of 17?
```

```
 1    A.    I was working.

 2    Q.    Working doing what?

 3    A.    I helped my mother with her work and I cleaned houses.

 4    Q.    Is that what your mother does?

 5    A.    Yes.

 6    Q.    She got you a job with the same company she works for?

 7    A.    She works independently and I did work with her.

 8    Q.    Okay.  Did you work with her every day?

 9    A.    Yes.

10    Q.    Okay.  But have you always worked with her every day

11    from when you dropped out of school through, let's say, 2008?

12    A.    Yes.

13    Q.    Okay.  During 2008, though, you spent a lot of time with

14    Edwin Alas; right?

15    A.    Yes.

16    Q.    You weren't working full-time as a house cleaner while

17    you were spending the time with Edwin Alas; correct?

18    A.    No.

19    Q.    And how much did you make when you were cleaning houses?

20    A.    $60, $70.

21    Q.    Sixty or $70 how often?

22    A.    When I worked with my mom, she would give me that every

23    day.

24    Q.    And did you sometimes work, but not with your mother?

25    A.    Yes.
```

1    Q.   Okay.  How much did you make then?

2    A.   $80.

3    Q.   Now, when did you happen to meet Edwin Alas?

4    A.   I met him in May.

5    Q.   May of what year?

6    A.   2007.

7    Q.   I'm sorry?

8         THE INTERPRETER:  Interpreter repeats, 2007.

9    BY MR. SCROGGIE:

10   Q.   And did you immediately start dating Edwin Alas or did

11   it take a while before that happened?

12   A.   No, it took a little while.

13   Q.   Tell us about your relationship with Mr. Alas, how it

14   began.

15   A.   We started being friends.  I used to see him sometimes

16   at parties.  Then we started dating as boyfriend and

17   girlfriend.

18   Q.   When did that happen?

19   A.   In July.

20   Q.   Of 2007?

21   A.   Yes.

22   Q.   What was Mr. Alas like as of July 2007?

23   A.   He was a nice person to me.

24   Q.   Did you change your mind about that at some point during

25   your relationship with him?

UNITED STATES DISTRICT COURT

```
 1    A.    Yes.

 2    Q.    And how did you come to change your mind about Mr. Alas

 3    after you had been with him for a while?

 4    A.    Once we had an argument, he turned very violent.  He's a

 5    very violent person.

 6    Q.    Do you remember what that argument was about?

 7    A.    I don't recall really well.

 8    Q.    Do you recall when it was?

 9    A.    In the month of August.

10    Q.    Of 2007?

11    A.    Yes.

12    Q.    How long did you have a relationship with Mr. Alas?

13    A.    For almost a year.

14    Q.    Up through June of 2008; correct?

15    A.    Yes.

16    Q.    Did you have a lot of arguments with Mr. Alas?

17    A.    Yes.

18    Q.    You say that you learned that he's a violent person.

19    What makes you say that he's a violent person?

20    A.    He used to insult me verbally and he even slapped me.

21    Q.    Slapped you?

22    A.    Yes.

23    Q.    And what, if anything, else did he do to you?

24    A.    He would pull my hair.

25    Q.    Okay.  And how frequently did this happen?
```

1    A.    Not very often because I tried not to make him mad.

2    Q.    And I guess you stayed with him for about a year; right?

3    A.    Yes.

4    Q.    You stayed with him until the date of your arrest;

5    correct?

6    A.    Yes.

7    Q.    If he's a violent person, why did you stay with him?

8    A.    He wasn't violent all of the time with me.  After he

9    would abuse me, he always asked for forgiveness.  And I

10   wanted things to be fine between him and me.  I felt lonely

11   and depressed.  And I tried my best so that he would be happy

12   with me.

13   Q.    After you met Mr. Alas, did you continue working with

14   your mother?

15   A.    Some of the days.

16   Q.    And what did Mr. Alas do during the day when you met

17   him?

18   A.    When I met him?

19   Q.    Well, when you started going out with him.

20   A.    He said he was going to school.

21   Q.    Okay.  Was he going to school or do you know?

22   A.    That's what he told me.  He lived far away from my

23   house.

24   Q.    At some point did Mr. Alas ask you to purchase sinus or

25   cold pills for him?

```
 1   A.   Yes.

 2   Q.   When did he ask you to do that?

 3   A.   In the month of February.

 4   Q.   Of what year?

 5   A.   2008.

 6   Q.   And before he asked you to buy these pills for him, were

 7   you aware that he was buying them himself?

 8   A.   He had mentioned to me that he wanted to start buying

 9   them.

10   Q.   What did he say about that?

11   A.   He asked me as a favor to accompany him to the store and

12   he was going to show me which -- which kind I should buy.

13   Q.   Now, this is when he asked you to buy for him; right?

14   A.   Yes.

15   Q.   And that was about February of 2008?

16   A.   Yes.

17   Q.   Okay.  Now, before he asked to you buy pills for him,

18   though, had you become aware that he was purchasing pills

19   without you?

20   A.   I think that yes, a few times.

21   Q.   Okay.  And when was it -- when was it, if you did --

22   when was it that you became aware that he was buying cold

23   pills at drug stores?

24   A.   When?

25   Q.   Yes, when.
```

1   A.   Just a short while before he told me that to -- he asked

2   me to buy them.

3   Q.   Okay.  What did he -- tell me how he -- what was he said

4   when he asked you to start buying them for you?

5           MS. WILLIAMS:  Objection.  Hearsay.

6           THE COURT:  Sustained.

7   BY MR. SCROGGIE:

8   Q.   What did he show you to do?  You say that he took you

9   around and showed you what he wanted done.  What did he show

10  you to do?

11  A.   He took me to a store and he bought the pills and he

12  showed me how and what kind I could ask for.

13  Q.   And on that first time that he showed you, did you, in

14  fact, buy pills?

15  A.   Yes, he took me to another store.

16  Q.   You went to more than one store the first day?

17  A.   I think two of them.  I'm not sure.

18  Q.   Okay.

19           What did he tell you about why he wanted you to buy

20  the pills?

21           MS. WILLIAMS:  Objection.  Hearsay.

22           THE COURT:  Sustained.

23  BY MR. SCROGGIE:

24  Q.   Did you know why he wanted you to buy the pills?

25  A.   No.

1    Q.    Did you ask him why on that day?

2    A.    Not that day.  Later on.

3    Q.    And that first day, that was in February of 2008?

4    A.    I don't remember whether or not it was February or

5    March.

6    Q.    Well, you've heard testimony in the trial yesterday that

7    you were making purchase in February of 2008; right?

8    A.    Yes.

9    Q.    And you don't have any reason to believe that the

10   records of your purchases are inaccurate; correct?

11   A.    No, it's correct.

12   Q.    Prior to Mr. Alas asking to you buy these cold pills,

13   had you ever bought them before?

14   A.    No, I had never seen them.

15   Q.    And beginning on that first day that you bought them,

16   you rode around with him and others and bought a lot of these

17   pills for over several months; correct?

18          MS. WILLIAMS:  Objection.  Leading, Your Honor.

19          THE COURT:  Sustained.  Rephrased.

20   BY MR. SCROGGIE:

21   Q.    Okay.  So you've talked about the first day that you

22   bought the pills.

23          Was that the last time you bought the pills?

24   A.    No.

25   Q.    Did you buy the pills on other days in February of 2008?

UNITED STATES DISTRICT COURT

```
 1    A.   I think so.

 2    Q.   Did you buy the same kind of pills in March of 2008?

 3    A.   Yes.

 4    Q.   Did you buy the same kind of pills in April of 2008?

 5    A.   Yes.

 6    Q.   Did you buy the same kind of pills in May of 2008?

 7    A.   Yes.

 8    Q.   Did you buy the same kind of pills in June of 2008?

 9    A.   Yes.

10    Q.   Okay.  Over that period of time, why did you buy those

11    pills?

12    A.   Because he was asking me to.

13    Q.   Okay.  Now, over the course of that several month

14    period, did you ever start to wonder why he wanted you to buy

15    those pills?

16    A.   I asked him.  I asked Edwin.

17    Q.   Do you recall about when you asked him?

18    A.   No.

19    Q.   Okay.  Do you recall what you asked him?

20    A.   Yes.

21    Q.   Okay.  What did you ask him?

22    A.   I asked what were those -- all those pills for.

23    Q.   What did he tell you?

24    A.   The first time he told me that it was better for me not

25    to know.
```

```
 1   Q.   Did you ask him any more questions after he said that?

 2   A.   No, because he answered that in not a very nice way.

 3   Q.   And so why didn't you ask him a follow-up question?

 4   A.   I was always afraid of asking him anything.

 5   Q.   And why is that?

 6   A.   Because he was a violent person and he always answered

 7   me in a nasty way, and I didn't like him to yell at me.

 8   Q.   Okay.  You heard him testify yesterday; correct?

 9   A.   Yes.

10   Q.   And you heard him admit that he slapped you on at least

11   that one day because you were argumentative with him; right?

12   A.   It was more than once.

13   Q.   Okay.  Was it common for him to slap you if he thought

14   you were being argumentative?

15   A.   Yes.

16   Q.   Your sister -- you heard your sister testify yesterday

17   afternoon; correct?

18   A.   Yes.

19   Q.   I believe she actually testified that he punched you in

20   the face in May of 2008.

21             Is that what happened?

22             MS. WILLIAMS:  Objection.  Misstates the testimony.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes.

25             ///
```

1    BY MR. SCROGGIE:

2    Q.    Did he punch you with a closed fist?

3    A.    Yes, but he always tried not to leave marks on me.

4    Q.    And what do you mean by that?

5    A.    Because I always told him that I would call the police.

6    Q.    So after that first time -- and why -- what were the

7    circumstances under which you decided to ask him what -- why

8    do you want all these pills?

9    A.    Why didn't I ask him why he wanted so many pills?

10    Q.    No, what made you decide, on the day that you did ask

11    him, to ask him that question, "Why do you want all these

12    pills"?

13            THE INTERPRETER:  Could you repeat the question for

14    the interpreter, please?

15            MR. SCROGGIE:  Sure.  I'm sorry if I'm unclear.

16    BY MR. SCROGGIE:

17    Q.    At some point -- well, between February and June, you

18    rode around with Edwin and other people and bought a lot of

19    these pills; right?

20    A.    Yes.

21    Q.    Okay.  Did that seem normal to you?

22    A.    No, not to do it every day.

23    Q.    Okay.  And did you grow tired of doing it?

24    A.    Yes.

25    Q.    And at some point you asked Edwin what is the -- what do

UNITED STATES DISTRICT COURT

```
 1    you want all these pills for; is that what you just
 2    testified?
 3    A.   Yes.
 4    Q.   And why was it that you asked him that question?
 5    A.   I would finally ask why I needed them.
 6    Q.   And you told us his answer.
 7         Did you ever ask him again?
 8    A.   Yes.
 9    Q.   Okay.  What answer did he give you the next time you
10    asked him about the pills?
11    A.   That he was taking them -- he and his friends would take
12    them with Red Bull.  In fact, he asked me if I wanted to try
13    it.
14    Q.   Did you try it?
15    A.   No.
16    Q.   Okay.  Were you satisfied with that answer?
17    A.   No.
18    Q.   Okay.  Tell us how -- tell us how you would go about
19    going into a store to buy the pills.
20    A.   Well, I would ride -- or we would ride -- no, I would
21    drive to the store, and before going into the store, he would
22    tell me which kind I should buy.  He would give me the money.
23    I would go into the store and I would ask the cashier what
24    kind I needed.
25    Q.   And then there was a process to buy those pills, the
```

1    clerk would ask for your I.D.; correct?

2    A.   Yes, and after that I had to sign.

3    Q.   Okay.  So you would ask for the pills, then the clerk

4    would tell you that she needed to see your identification;

5    correct?

6    A.   Yes.

7    Q.   And then -- and then there would be a little electronic

8    screen where you would have to sign your name electronically;

9    right?

10   A.   Yes.

11   Q.   And when you would do this, the identification that you

12   would show, was that in your true name?

13   A.   Yes.

14   Q.   And you signed that name; is that what you did?

15   A.   Yes.

16   Q.   Okay.  Did that concern you at all that you were buying

17   these pills using your correct identification and so forth?

18   A.   No.  I thought it was legal.  It was legal to me because

19   I was showing my I.D.

20   Q.   Now, you said that he would give you money before you

21   went in the stores.

22   A.   Yes.  At the beginning, he started giving me 100 or $200

23   so that I could buy them.

24   Q.   And how many purchases would you make with that one or

25   $200?

UNITED STATES DISTRICT COURT

1    A.    It depends on which kind he told me to buy.

2    Q.    Now, when was it he would give you that money?  Every

3    day or how?

4    A.    Every day in the morning.

5    Q.    And did you and Edwin have an argument at some point

6    about that money he was giving you in the morning?

7    A.    Yes, because he was thinking that I was keeping his

8    change.

9    Q.    So when he would give you the money in the morning, was

10   that the money for the whole day?

11   A.    Yes.

12   Q.    And then he -- he argued with you that he wasn't getting

13   his change back at the end of the day?

14   A.    Yes.

15   Q.    So then did he make any changes on how he told you to do

16   this after that argument?

17   A.    Yes.

18   Q.    What did he do after that day?

19   A.    Well, he would give me the exact amount that I was going

20   to need or he would -- at the store -- or he would give me

21   $20.

22   Q.    So he changed and would give you money before you went

23   into each store; is that your testimony?

24   A.    Yes.

25   Q.    You heard Edwin testify yesterday; correct?

```
 1   A.   Yes.

 2   Q.   Okay.  And you heard him testify that he was -- lent you

 3   $500 and then you bought the pills yourself from that day

 4   forward; right?

 5   A.   Yes.

 6   Q.   Did that happen?

 7   A.   He never loaned me any money.

 8   Q.   Okay.  Did you ever buy pills with your own money?

 9   A.   No.

10   Q.   When Edwin asked you to start doing this with him, did

11   he tell you why he wanted you to do it?

12   A.   No.

13   Q.   You did a lot of the driving over the course of between

14   February and June when these pills were purchased; correct?

15             THE INTERPRETER:  When what?

16   BY MR. SCROGGIE:

17   Q.   When the pills were purchased from February to June of

18   2008.

19   A.   Yes.

20   Q.   Is there a reason why you did most of the driving?

21   A.   Yes.

22   Q.   And what is that reason?

23   A.   First, he didn't have a license.  Edwin didn't have a

24   license.

25   Q.   Did he have a car?
```

```
1    A.   Hernandez sold him a car.

2    Q.   Do you know when that happened?

3    A.   I don't recall the month.

4    Q.   Did Edwin drive after he got that car?

5    A.   Not to make the purchases, because the car was always at

6    the mechanic's shop.

7    Q.   So -- and were you asked to do a lot of the driving?

8    A.   Yes.

9    Q.   Now, did Edwin -- did Edwin pay you to do all these pill

10   purchases?

11   A.   No.

12   Q.   Did -- you heard him testify how he would go sell the

13   pills and then give you the money, 25, $27 or so per box for

14   every box you had purchased.

15        You heard that testimony; right?

16   A.   I did hear that.

17   Q.   Is that true?

18   A.   No.

19   Q.   Were you a partner with Edwin in this?

20   A.   No.

21   Q.   Apart from maybe having kept the change at the end of a

22   day early on, did you make any money at all from this?

23   A.   No.

24   Q.   And how were you getting by during this time if you

25   weren't making money from Edwin?
```

1    A.   I asked my mother for money.

2    Q.   Did she give you money periodically?

3    A.   Yes.

4    Q.   How much would she give you?

5    A.   $20.

6    Q.   You also heard Edwin testify that you would go with him

7    when he delivered the pills to someone that he sold them to;

8    correct?

9    A.   I did hear him.

10   Q.   Is that true?

11   A.   No.

12   Q.   Okay.  Did you ever see the money that he got from the

13   sale of these pills?

14   A.   No.

15   Q.   Did you ever meet Pirulin?

16   A.   I saw him.  I just saw him on one occasion.

17   Q.   And how is it you came to see him?

18   A.   I was parked in my car and I saw him talking to Edwin

19   Alas.

20   Q.   Okay.  And how many times did you see him?

21   A.   Once or twice.

22   Q.   Okay.  And how did you happen to be at the location

23   where you saw him?

24   A.   Edwin asked me to give him a ride.  He said he needed to

25   talk to him.

1    Q.   Okay.  And did you know who Pirulin was or why Edwin

2    needed to talk to him?

3    A.   No.

4    Q.   Okay.  Did you ever see Edwin come back with a lot of

5    money from Pirulin?

6    A.   No.  He, Alas, never showed me any money.

7    Q.   Did you ever meet the person that Edwin described as

8    Elmer?

9    A.   Did I ever meet him?

10   Q.   Correct.

11   A.   I met somebody outside a store, but I don't know whether

12   or not that was Elmer.

13          THE INTERPRETER:  Your Honor, I'm going to

14   substitute.

15          THE COURT:  Sure.  One moment.

16   BY MR. SCROGGIE:

17   Q.   So you think you may have met Elmer once?

18   A.   Yes, the day that they met him.  That Hernandez and Alas

19   met him.

20   Q.   Okay.  Were you introduced to him on that day?

21   A.   No.

22   Q.   Okay.  Did you -- did you overhear the conversation that

23   David and Edwin had with -- with Elmer?

24   A.   No, I waited in my car.

25   Q.   Do -- did you ever -- did you ever see Elmer give Edwin

1    or David or anyone else money?

2    A.    No, I just really saw him that day.

3    Q.    I believe there was some talk about a person named

4    Miguel and/or a person named Fantasma.

5          Did you ever meet either of those guys?

6    A.    About Miguel, yes.

7    Q.    Okay.  You met Miguel?

8    A.    I knew that he was Hernandez's and Alas's mechanic.

9    Q.    And have you been to the mechanic shop?

10   A.    I have waited outside.

11   Q.    Okay.  And what was your -- why did you happen to be

12   outside at the mechanic's shop?

13   A.    Because Alas had his car at the mechanic's shop and he

14   would go there to talk to the mechanic.

15   Q.    And that's what Alas told you?

16   A.    Yes.  Well, I saw the car at the shop.

17   Q.    Okay.  And how many times do you believe that you were

18   at the mechanic's shop?

19   A.    About five.

20   Q.    Okay.  Did you ever see Edwin pick up money at the

21   mechanic's shop?

22   A.    No.  Well, I always waited in my car.

23   Q.    Okay.  Did you ever see Edwin deliver pills to the

24   mechanic's shop?

25   A.    Not pills, but I did see that he would take a bag to the

UNITED STATES DISTRICT COURT

1    shop.

2    Q.   What kind of bag?

3    A.   Sometimes he would take a backpack or a white plastic

4    bag.

5    Q.   Did you know what was in either of those bags?

6    A.   No.  Sometimes he would say that he was taking a part

7    for the car to the mechanic.

8    Q.   When you would go around with Edwin and the others and

9    buy these pills, what was the routine at the end of the day

10   after you went to the last store?

11        THE INTERPRETER:  Would you mind repeating the

12   question for the interpreter, please?

13        MR. SCROGGIE:  Sure.

14   BY MR. SCROGGIE:

15   Q.   I'm wondering when you and Edwin and perhaps one or two

16   other people typically would go around to these CVS stores

17   and buy these pills, where would you go after you bought the

18   pills at the last store?

19   A.   He would go to leave them at Hernandez's house.  Alas or

20   Hernandez's house.  And then I would go back to my house.

21   Q.   Okay.  Did you ever take pills with you after you split

22   off from Edwin and David and the other fellows?

23   A.   On two occasions.

24   Q.   Okay.  And why did that happen?

25   A.   Because Edwin would ask me to.  But the following day,

UNITED STATES DISTRICT COURT

```
 1    very early, Edwin would come to get them.

 2    Q.   Okay.  Did you ever sell pills yourself to anyone?

 3    A.   No.

 4    Q.   Now, at any time when you went around and made these

 5    pill purchases, all the way up to the end, did you know that

 6    those cold pills could be used to make methamphetamine?

 7    A.   No, I didn't even have any idea what methamphetamine

 8    was.

 9    Q.   Okay.  And up -- right up to the time you were arrested,

10    did you ever know that those pills could be used to make any

11    kind of illegal drug?

12    A.   After my arrest, I did.

13    Q.   Okay.  After your arrest you learned that those pills

14    can be used to make drugs?

15    A.   Yes.

16    Q.   You heard the DEA agent, Bradley Clemmer, testify

17    yesterday about how the pills are used to make

18    methamphetamine; right?

19    A.   Yes.

20    Q.   Before you heard Mr. Clemmer -- Agent Clemmer testify

21    yesterday, had you ever heard that how -- how those pills are

22    used to make meth?

23    A.   No, never.

24         MR. SCROGGIE:  Okay, nothing further, Your Honor.

25         THE COURT:  Cross-examination?
```

```
 1                MS. WILLIAMS:  Your Honor, may counsel briefly

 2      approach?

 3                THE COURT:  You may.

 4                (Sidebar conference commenced.)

 5                MS. WILLIAMS:  The Government at some point would

 6      like to inquire further about whether the defendant has ever

 7      seen methamphetamine.

 8                MR. SCROGGIE:  Used you say?

 9                MS. WILLIAMS:  Well, the Government has reason to

10      believe --

11                MR. SCROGGIE:  I didn't hear you.

12                MS. WILLIAMS:  The Government --

13                THE COURT:  Direct your comments to me.

14                MS. WILLIAMS:  The Government has reason to believe

15      that the defendant has, in fact, used methamphetamine in the

16      past.  We didn't want to bring it up in our case in chief.

17      She's claims she didn't know what methamphetamine was.  The

18      Government would at least like to inquire further whether she

19      has, in fact, seen methamphetamine before at parties.

20                THE COURT:  You may inquire.

21                (Side bar conference concluded.)

22                        CROSS-EXAMINATION

23      BY MS. WILLIAMS:

24      Q.   Ms. Mungia, this is you in this photograph; right?

25      A.   Yes.
```

```
 1              THE COURT:  Ms. Williams, could you put the
 2    microphone a little closer.
 3    BY MS. WILLIAMS:
 4    Q.   And this is you in the bottom photograph; right?
 5    A.   Yes.
 6              THE COURT:  I'm sorry, Ms. Williams, can you
 7    indicate what Exhibit you're referring to?
 8              MS. WILLIAMS:  I'm sorry.  That, Your Honor, is
 9    Exhibit 10.
10              THE COURT:  Thank you.
11    BY MS. WILLIAMS:
12    Q.   Still with Exhibit 10.  That's you in that photograph;
13    right?
14    A.   Yes.
15    Q.   And Exhibit 9, this is you in the bottom photograph;
16    right?
17    A.   Yes.
18    Q.   And Exhibit 9 still, this is you walking to your car;
19    right?
20    A.   Yes.
21    Q.   And you're holding packs of Pseudoephedrine pills in
22    your hand; right?
23    A.   That's what it looks like.
24    Q.   And you were holding Pseudoephedrine pills in your hand;
25    right?
```

```
 1   A.   I bought them, I think so.

 2   Q.   And that's your car?

 3   A.   Yes.

 4   Q.   That's a nice car, Ms. Mungia.

 5        How did you pay for that?

 6   A.   The car is my mother's.  My mother allowed me to drive

 7   it.

 8   Q.   And you drove this car all day long every day for three

 9   and a half months to buy the Pseudoephedrine pills?

10   A.   Yes.

11   Q.   Ms. Mungia, I'm going to show you Exhibit 3.  This is

12   your MethCheck report.  I'm going to show you the very last

13   page of this.  Down here where it says "February 28, 2008."

14        And that's your signature; right?

15   A.   Yes.

16   Q.   And everything in this report is correct; right?

17   A.   Yes.

18   Q.   And this is your signature on each of these pages?

19   A.   Yes.

20   Q.   And it's here over 600 times?

21   A.   Yes.

22   Q.   And this was tiring; wasn't it, Ms. Mungia?

23   A.   Yes.

24   Q.   And so you eventually just started scribbling, the same

25   way that Edwin Alas described yesterday; right?
```

```
1    A.   Yes, because he told me that I was taking too long.

2    Q.   And you wanted to just get to the next store?

3    A.   Alas wanted to get to the following store.

4    Q.   You weren't living with him then, were you?

5    A.   No.

6    Q.   And in fact, you've never lived with him; have you?

7    A.   No.

8    Q.   And I think you even said that he lived far away from

9    your house; right?

10   A.   Yes.

11   Q.   Did he know what these pills were being used for?

12        THE INTERPRETER:  Excuse me, Counsel.  Interpreter

13   didn't hear correctly.  Did you say did you know or did he

14   know?

15        MS. WILLIAMS:  Did he know.

16        THE INTERPRETER:  Thank you.

17        THE WITNESS:  I didn't find out until now that he

18   always knew.

19   BY MS. WILLIAMS:

20   Q.   I'm going to show you a picture from Exhibit 22.

21        Do you know these guys, Carlos Mendoza, Edwin Alas,

22   and Jose Ramirez?

23   A.   Yes.

24   Q.   And you drove them around from pharmacy to pharmacy all

25   day long; right?
```

1   A.   Yes, because Edwin Alas would ask me to do it.

2   Q.   So you would spend all day with them; right?

3   A.   Yes.

4   Q.   And they knew what the pills were being used for; right?

5   A.   I don't know.  I never had any communication with them.

6   Q.   You spent all day with them; right?

7   A.   Yes, because -- but they were not my friends.

8   Q.   You didn't talk to them in the car when you spent all

9   day with them for three and a half months?

10   A.   It was very little because Edwin would get annoyed.

11   Q.   Ms. Mungia, you said that you've never seen

12   Pseudoephedrine pills.  You had never seen Pseudoephedrine

13   pills before you started buying them; right?

14   A.   No, I had never paid attention.

15   Q.   And so you started buying these pills that you'd never

16   seen before?

17   A.   No.  Only Claritin.

18   Q.   I'm going to show you Exhibit 41.

19        You started buying these pills that you had never

20   seen before February 26th.

21   A.   Yes.

22   Q.   And Edwin Alas didn't go with you that day; right?

23   A.   Yes, he showed me how to do it.

24   Q.   Was he buying with you then, showing you?

25   A.   Yes, I think he did buy that day.

1   Q.   Would it surprise you then that Edwin Alas's MethCheck

2   report doesn't show a purchase for him that day?

3   A.   No, it would not surprise me.

4   Q.   And so you continued to buy these pills that you had

5   never seen before then?  In March?  Right?

6   A.   Yes.

7   Q.   And in April?

8   A.   Yes.

9   Q.   And in May?

10  A.   Yes.

11  Q.   And in June?

12  A.   Yes.

13  Q.   And 550 times you went to a CVS store and bought pills

14  that you claim you had never seen before?

15  A.   Yes.

16  Q.   And on February 26th, that was your first day, and the

17  MethCheck report for Edwin Alas does not show him purchasing

18  at the same stores as you, but you remember him purchasing

19  with you?

20  A.   I don't remember too well, but he showed me how to do it

21  that day.

22  Q.   And Ms. Mungia, it's your testimony that when you first

23  asked him what these pills were being used for, it was

24  because you knew this wasn't normal I think was the term you

25  used; right?

1   A.   Yeah.  Yes.

2   Q.   And you said that he told you it's better for you not to

3   know; is that right?

4   A.   The first time I asked him, yes.

5   Q.   And you continued to buy them all these times after he

6   said that to you?

7   A.   Yes.

8   Q.   And he wasn't always buying with you, was he?

9   A.   Most of the time he was.

10   Q.   But there were days when you went out on your own and

11   did this; right?

12   A.   Those were few times.

13   Q.   But there were days when you did this on your own;

14   right?

15   A.   Yes, but I would give them to him.

16   Q.   And you didn't see him that day, though; right?

17   A.   Because he had to -- they called him from work.

18   Q.   And so you didn't see him that day; right?

19   A.   No.

20   Q.   And -- but you went out and purchased on May 1st, 13 --

21   you went to 13 stores that day and you hadn't seen him that

22   day; right?

23   A.   I can't remember the date nor how many stores I went to,

24   but it is possible that I did not see him that day.

25   Q.   And you were using your own money then; right?

UNITED STATES DISTRICT COURT

1  A.   No, he would always leave me money ahead of time when he

2  had to go to work.

3  Q.   And when you would go into a CVS pharmacy and make these

4  purchases, you had to show your I.D.; right?

5  A.   Yes.

6  Q.   And you had to sign your name; right?

7  A.   Yes.

8  Q.   And you gave your real I.D.; right?

9  A.   Yes.

10 Q.   And that's because you didn't know about MethCheck?

11 A.   No.

12 Q.   And just like Edwin Alas gave his real I.D.; right?

13 A.   Yes.

14 Q.   And he knew what was going on with the pills, but he

15 didn't know about MethCheck?

16 A.   I think so.  He would never talk to me about anything

17 like that.

18 Q.   And David Hernandez, he used his real I.D.; right?

19          MR. SCROGGIE:  Object, Your Honor.  Calls for

20 speculation.

21          THE COURT:  Overruled.

22          THE WITNESS:  I believe so.

23 BY MS. WILLIAMS:

24 Q.   And that's because he didn't know about MethCheck;

25 right?

```
 1              MR. SCROGGIE:  Objection.  Calls for speculation.

 2              THE COURT:  Sustained.

 3    MS. WILLIAMS:

 4    Q.   And you've met Pirulin?

 5    A.   Just by sight.

 6    Q.   You've seen him?

 7    A.   Yes.

 8    Q.   On more than one occasion?

 9    A.   On two occasions.

10    Q.   And you have met Elmer; right?

11    A.   I saw him on one occasion.

12    Q.   And you've met Miguel?

13    A.   I would see him.  He would come to the mechanic's shop.

14    Q.   And it was at that the shop where you saw Edwin Alas

15    take a bag a couple of times -- I think you said five times

16    -- five different times -- you would go there and he would

17    take a bag, and sometimes it would be a white plastic bag;

18    right?

19    A.   Not always.

20    Q.   But you did see him carrying a white plastic bag then;

21    right?

22    A.   Yes.

23    Q.   Ms. Mungia, I'm going to ask you to look at Exhibit 1.

24    And it's a physical exhibit.

25              MS. WILLIAMS:  May Special Agent Gunderson assist?
```

```
 1              THE COURT:  He may.

 2   BY MS. WILLIAMS:

 3   Q.   It was a white plastic bag like that; right?

 4   A.   Yes.

 5   Q.   Filled in that same way?

 6              THE INTERPRETER:  Excuse me?

 7   BY MS. WILLIAMS:

 8   Q.   Filled in that same way?

 9   A.   I did not know -- I didn't see what was inside of it.

10   Q.   And you saw a bag like that, at least on five different

11   occasions you said, at the mechanic's shop?

12   A.   I did not say on five different occasions.

13   Q.   How many times?

14   A.   Once or twice.  Twice.

15   Q.   Do you recognize that bag?

16   A.   Yes.

17   Q.   And that was the bag that was right at your feet at the

18   time you were arrested?

19   A.   Yes, in Alas's car.

20   Q.   And you were sitting in the back and that bag was right

21   at your feet?

22   A.   Yes.  Well, I don't remember it being right by my feet,

23   but I was seated in the back.

24   Q.   And you had banded all those pills together that day;

25   right?
```

1    A.   No, I didn't pack them.

2    Q.   That wasn't your job that day?

3    A.   No, I did not used to pack them.

4            MS. WILLIAMS:  Could I have one moment, Your Honor?

5            THE COURT:  You may.

6    BY MS. WILLIAMS:

7    Q.   Ms. Mungia, the way that the pills are packaged in that

8    bag, you saw them being bound in that way many, many times?

9    A.   Yes.

10   Q.   On all of those days when you went out and bought the

11   pills, this is how you and the others packaged them; right?

12   A.   The others would pack them and I did the driving.

13   Q.   The day that you were arrested, were you doing the

14   driving?

15   A.   No.

16   Q.   And you saw thousands of these pills; rights?

17   A.   Not thousands.  There were many pills, but I don't

18   believe they were thousands.

19   Q.   Ms. Mungia, you yourself purchased thousands of pills?

20   A.   Yes.

21   Q.   You and Edwin Alas did not have a perfect relationship,

22   did you?

23   A.   That's right.

24   Q.   And you started dating in July of 2007?

25   A.   Yes.

```
1    Q.   And then you left for a time to go back to El Salvador;
2    is that right?
3    A.   Yes.
4    Q.   And when you came back, Edwin Alas was dating somebody
5    else; right?
6    A.   He didn't tell me anything.
7    Q.   He was living with someone then; right?
8    A.   I don't know.
9    Q.   The mother of his child, he was living with her?
10   A.   Okay.
11   Q.   Did you ever go over to his house?
12   A.   At the beginning, yes, I went to his house when we
13   started dating.
14   Q.   But when you came back from El Salvador in October of
15   2007, he was with somebody else, and you were angry about
16   that?
17   A.   I never went back to his house, and I don't know if he
18   was living with somebody then.
19   Q.   So you never went back to his house?
20   A.   No.
21   Q.   And you -- the two of you lived far apart?
22   A.   Yes.
23   Q.   And you knew that he had a child with another woman?
24   A.   Yes.
25   Q.   And you wanted him to leave her?
```

UNITED STATES DISTRICT COURT

1    A.    When I met him, he told me he no longer was with her.

2    Q.    And when you guys started buying the Pseudoephedrine

3    pills together, he was still with her; right?

4    A.    With her?  Who do you mean by "her"?

5    Q.    The mother of his child.

6    A.    I always knew she was the mother of his daughter, but I

7    didn't know if they were together.

8    Q.    You were angry that he didn't want to be with you?

9    A.    At no time did he tell me that he didn't want to be with

10   me.

11   Q.    And you're angry with Edwin Alas now, aren't you?

12   A.    Well, he lied to me, but he's indifferent to me.

13   Q.    You have no feelings one way or the other?

14   A.    No.

15   Q.    You heard his testimony yesterday?

16   A.    Yes.

17         MS. WILLIAMS:  One moment, Your Honor.

18         THE COURT:  You may.

19   BY MS. WILLIAMS:

20   Q.    Just a couple final questions, Ms. Mungia.

21         You spent a lot of time with Edwin Alas; right?

22   A.    Yes.

23   Q.    You were with him most of these times?

24   A.    Yes.

25   Q.    But not all of them?

UNITED STATES DISTRICT COURT

```
 1   A.   Yes.

 2   Q.   And you would start out early in the morning to go buy

 3   these pills and end late at night?

 4   A.   Yes, that's what we did.

 5   Q.   Over and over again?

 6   A.   Yes.

 7   Q.   And the other guys would ride with you in the car?

 8   A.   Yes.

 9   Q.   And you spent a lot of time with them?

10   A.   Well, with them, yes.

11   Q.   Because you would spend all day together, you would get

12   lunch and you would go to -- up to 27 stores in a day?

13   A.   Yes.

14   Q.   And you bought over 800 boxes of Pseudoephedrine pills?

15   A.   What day are you talking about?  Oh, you mean in general

16   the whole time?

17   Q.   Yes.

18   A.   The whole -- all of the months?

19   Q.   Yes, over 800 boxes?

20   A.   Yes.

21        MS. WILLIAMS:  No further questions.

22        THE COURT:  Ladies and gentlemen, we're going to

23   break for 15 minutes.  Remember not to discuss the case among

24   yourselves or with anyone else.  Don't form or express any

25   opinions about the case until it's finally submitted to you.
```

UNITED STATES DISTRICT COURT

1    We'll see you in about 15 minutes.

2              (Open court - jury not present).

3              THE COURT:  She may step down.

4              Mr. Scroggie, how long do you anticipate your

5    redirect?

6              MR. SCROGGIE:  Very brief, Your Honor.

7              THE COURT:  Pardon?

8              MR. SCROGGIE:  Very brief.

9              THE COURT:  Okay.  Do you anticipate any additional

10   witness?

11             MR. SCROGGIE:  She's the last witness.  I'll rest.

12             THE COURT:  Does the Government anticipate any

13   rebuttal?

14             MS. WILLIAMS:  No, Your Honor.

15             THE COURT:  So what we'll do then probably, I was

16   planning to break for an extended lunch anyway.  Let's see if

17   we can wrap up the jury instructions and verdict form and

18   then we'll instruct and argue at 1:30.

19             MR. SCROGGIE:  That's fine.

20             THE COURT:  The verdict form I have, I'm not sure,

21   I may be missing one.  I'm not sure if you filed a second one

22   that was filed in May?  The verdict form.

23             MS. WILLIAMS:  Your Honor, I apologize, the

24   Government did not file a new verdict form.  There's no

25   special --

```
 1              THE COURT:  There's no changes?

 2              MS. WILLIAMS:  Well, the verdict form that we filed

 3    in May is a special verdict form asking for quantities --

 4              THE COURT:  Right.

 5              MS. WILLIAMS:  -- for the aiding and the abetting

 6    for the conspiracy of -- for the methamphetamine --

 7              THE COURT:  Correct.

 8              MS. WILLIAMS:  -- object that we're no longer going

 9    forward on.  So there is no special verdict form.

10              THE COURT:  That's what I was confused about,

11    because when I looked at the jury instructions and they made

12    only reference to Count 2 on aiding and abetting, I thought I

13    either missed something.  Okay.

14              Then over the lunch break, if you could bring a

15    revised verdict form.

16              MS. WILLIAMS:  Yes, Your Honor.

17              THE COURT:  All right.

18              (Recess from 10:43 a.m. to 10:58 a.m.)

19              (Open court - jury not present.)

20              THE COURT:  Counsel, do you anticipate any further

21    inquiry with regard to Exhibit 1?

22              MR. SCROGGIE:  What about Exhibit 1, Your Honor?

23              THE COURT:  Do you anticipate any further inquiry?

24              MR. SCROGGIE:  You know, Your Honor, over the

25    break, I decided to just rest now.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  If you could go ahead and put away the

2     exhibit.

3          All right, I've got to leave by 11:45 if we can

4     accomplish pre-instructing, I'd like to do it.  I have a

5     final version of the jury instructions.  If counsel would

6     take one last look at them.  You may approach and then let me

7     know if they're good to go or if there are any changes that

8     need to be made.  And then once I hear back from you, I'll

9     return.  Okay, so if I can get started at 11:15, I'd like to

10    instruct this morning, and then when we come back at 1:30,

11    we'll have argument.

12          MR. SCROGGIE:  Very well, Your Honor.

13          MR. MICHAELS:  Very well, Your Honor.

14          (Recess from 10:59 a.m. to 11:13 a.m.)

15          (Open court - jury present).

16          THE COURT:  Mr. Scroggie, any redirect of

17    Ms. Mungia?

18          MR. SCROGGIE:  No, Your Honor.

19          THE COURT:  Any additional witness for the defense?

20          MR. SCROGGIE:  No, Your Honor.  The defense rests.

21          THE COURT:  Any rebuttal for the Government?

22          MS. WILLIAMS:  No, Your Honor.

23          THE COURT:  Members of the jury, now that you have

24    heard all of the evidence, it is my duty to instruct you on

25    the law which applies to this case.  A copy of these

UNITED STATES DISTRICT COURT

1    instructions will be available in the jury room for you to

2    consult.

3         It is your duty to find the facts from all of the

4    evidence in the case.  To those facts you will apply the law

5    as I give it to you.  You must follow the law as I give it to

6    you whether you agree with it or not.  And you must not be

7    influenced by any personal likes or dislikes, opinions,

8    prejudices, or sympathy.  That means that you must decide the

9    case solely on the evidence before you.  You will recall that

10   you took an oath promising to do so at the beginning of the

11   case.

12        In following my instructions, you must follow all

13   of them and not single out some and ignore others.  They are

14   all equally important.  You must not read into these

15   instructions or into anything the Court may have said or done

16   any suggestion as to what the -- what verdict you should

17   return.  That is a matter entirely up to you.

18        The Indictment is not evidence.

19        The defendant has pleaded not guilty to the

20   charges.  The defendant is presumed to be innocent and does

21   not have to testify or present any evidence to prove

22   innocence.  The Government has the burden of proving every

23   element of the charge beyond a reasonable doubt.

24        Proof beyond a reasonable doubt is proof that

25   leaves you firmly convinced that a defendant is guilty.  It

1    is not required that the Government prove guilt beyond all

2    possible doubt.  A reasonable doubt is a doubt based upon

3    reason and common sense and is not based purely on

4    speculation.  It may arise from a careful and impartial

5    consideration of all of the evidence or from lack of

6    evidence.

7            If after a careful and impartial consideration of

8    all of the evidence, you are not convinced beyond a

9    reasonable doubt that the defendant is guilty, it is your

10   duty to find the defendant not guilty.

11           On the other hand, if after careful and impartial

12   consideration of all of the evidence, you are convinced

13   beyond a reasonable doubt that the defendant is guilty, it is

14   your duty to find the defendant guilty.

15           The evidence from which you are to decide what the

16   facts are consists of:

17           One, the sworn testimony of any witness;

18           Two, the exhibits which have been received into

19   evidence;

20           And three, any facts to which the lawyers have

21   stipulated.

22           In reaching your verdict, you may consider only the

23   testimony and exhibits received into evidence.  Certain

24   things are not evidence and you may not consider them in

25   deciding what the facts are.

1          I will list them for you:

2          One, arguments and statements by lawyer are not

3  evidence.  The lawyers are not witness.  What they have said

4  in their opening statements, closing arguments, and at other

5  times is intended to help you interpret the evidence but it

6  is not evidence.  If the facts as you remember them differ

7  from the way the lawyers state them, your memory of them

8  controls;

9          Two, questions and objections by lawyers are not

10 evidence.  Attorneys have a duty to their clients to object

11 when they believe a question is improper under the Rules of

12 Evidence.  You should not be influenced by the question, the

13 objection or the Court's ruling on it;

14         Three, testimony that has been excluded or stricken

15 or that you have been instructed to disregard is not evidence

16 and must not be considered.  In addition, some testimony and

17 exhibits have been received only for a limited purpose.

18 Where I have given a limiting instruction, you must follow

19 it;

20         Four, anything you may have seen or heard when the

21 court was not in session is not evidence.  You are to decide

22 the case solely on the evidence received at the trial;

23         Evidence may be direct or circumstantial.  Direct

24 evidence is direct proof of a fact, such as testimony of an

25 eyewitness.  Circumstantial evidence is indirect evidence

1    that is proof of a chain of facts from which you could find

2    another fact exists, even though it has not been proved

3    directly.  You are to consider both kinds of evidence.  The

4    law permits you to give equal weight to both, but it is for

5    you to decide how much weight to give to any evidence.

6            In deciding the facts in this case, you may have to

7    decide which testimony to believe and which testimony not to

8    believe.  You may believe everything a witness says or part

9    of it or none of it.

10           In considering the testimony of any witness, you

11   may take into account:

12           One, the opportunity and ability of the witness to

13   see or hear or know the things testified to;

14           Two, the witness's memory;

15           Three, the witness's manner while testifying;

16           Four, the witness's interest in the outcome of the

17   case and any bias or prejudice;

18           Five, whether other evidence contradicted the

19   witness's testimony;

20           Six, the reasonableness of the witness's testimony

21   in light of the all of the evidence;

22           And seven, any other factors that bear on

23   believability.

24           The weight of the evidence as to a fact does not

25   necessarily depend on the number of witness who testify.

UNITED STATES DISTRICT COURT

1        The defendant is on trial only for the crimes

2    charged in the Indictment, not for any other activities.

3        A separate crime is charged against the defendant

4    in each count.  You must decide each count separately.  Your

5    verdict on one count should not control your verdict on any

6    other count.

7        The parties have agreed to certain facts that have

8    been stated to you.  You should, therefore, treat those facts

9    as having been proved.

10        The defendant has testified.  You should treat this

11    testimony just as you would treat the testimony of any other

12    witness.

13        You have heard testimony from Edwin Alas, a witness

14    who pled guilty to a crime arising out of the same events for

15    which the defendant is on trial.  This guilty plea is not

16    evidence against the defendant and you may consider it only

17    in determining this witness's believability.  For this

18    reason, in evaluating Edwin Alas's testimony, you should

19    consider the extent to which or whether his testimony may

20    have been influenced by this factor.  In addition, you should

21    examine his testimony with greater caution than that of other

22    witnesses.

23        You have heard testimony from persons who, because

24    of education or experience, are permitted to state opinions

25    and the reasons for their opinions.

1          Opinion testimony should be judged like any other

2     testimony.  You may accept it or reject it and give it as

3     much weight as you think it deserves, considering the

4     witness's education and experience, the reasons given for the

5     opinion, and all the other evidence in the case.

6          Certain charts and summaries have been received

7     into evidence.  Charts and summaries are only as good as the

8     underlying supporting material.  You should, therefore, give

9     them only such weight as you think the underlying material

10    deserves.

11         The defendant is charged in Count 1 of the

12    Indictment with conspiring to possess a listed chemical,

13    Pseudoephedrine, knowing or having reasonable cause to

14    believe, that it would be used to manufacture a controlled

15    substance, namely methamphetamine, in violation of Section

16    846 and 841(c)(2) of Title 21 of the United States Code.

17         In order for the defendant to be found guilty of

18    Count 1, the Government must prove each of the following

19    elements beyond a reasonable doubt:

20         First, beginning on a date unknown and ending on or

21    about June 13th, 2008, there was an agreement between two or

22    more persons to possess a listed chemical, Pseudoephedrine,

23    knowing or having reasonable cause to believe that it would

24    be used to manufacture a controlled substance, namely

25    methamphetamine;

UNITED STATES DISTRICT COURT

1           And second, the defendant became a member of the

2    conspiracy knowing of its objective and intending to help

3    accomplish it.

4           I shall discuss with you briefly the law relating

5    to each of these elements.

6           A conspiracy is a kind of criminal partnership, an

7    agreement of two or more persons to commit one or more

8    crimes.  The crime of conspiracy is the agreement to do

9    something unlawful.  It does not matter whether the crime

10   agreed upon was committed.  For a conspiracy to have existed,

11   it is not necessary that the conspirators made a formal

12   agreement or that they agreed on every detail of the

13   conspiracy.  It is not enough; however, that they simply met,

14   discussed matters of common interest, acted in similar ways

15   or perhaps helped one another.  You must find that there was

16   a plan to commit the crime alleged in the Indictment as the

17   object of the conspiracy.

18          One becomes a member of the conspiracy by willfully

19   participating in the unlawful plan with the intent to advance

20   or further some object or purpose of the conspiracy, even

21   though the person does not have full knowledge of all of the

22   details of the conspiracy.

23          Furthermore, one who willfully joins an existing

24   conspiracy is as responsible for it as the originators.  On

25   the other hand, one who has no knowledge of a conspiracy but

1    happens to act in a way which furthers some object or purpose

2    of the conspiracy, does not thereby become a conspirator.

3    Similarly, a person does not become a conspirator merely by

4    associating with one or more persons who are conspirators,

5    nor merely by knowing that the conspiracy exists.

6            Count 1 of the Indictment alleges that in

7    furtherance of the charged conspiracy, several overt acts

8    were committed.  An overt act is a physical act committed by

9    a member of the conspiracy in furtherance of the objective of

10   the conspiracy.  While the Indictment alleges that a number

11   of overt acts were committed in furtherance of the

12   conspiracy, the Government need not prove that any overt act

13   was, in fact, committed.  Rather, the Government must prove

14   beyond a reasonable doubt only that the charged conspiracy

15   existed and that the defendant became a member of the charged

16   conspiracy knowing of its objective and intending to help

17   accomplish it.

18           Proof of the commission of one or more alleged

19   overt acts is evidence that you may consider in determining

20   whether the charged conspiracy existed and whether the

21   defendant was a knowing and willful member of the conspiracy.

22           A conspiracy may continue for a long period of time

23   and may include the performance of many transactions.  It is

24   not necessary that all members of the conspiracy join it at

25   the same time, and one may become a member of the conspiracy

1    without full knowledge of all of the details of the unlawful

2    scheme or the names, identities, or locations of all of the

3    other members.

4           Even though a defendant did not directly conspire

5    with other conspirators in the overall scheme, the defendant

6    has, in effect, agreed to participate in the conspiracy if it

7    is proved beyond a reasonable doubt that:

8           One, the defendant directly conspired with one or

9    more conspirators to carry out the object of the conspiracy;

10          Two, the defendant knew or had reason to know that

11   other conspirators were involved with those with whom the

12   defendant directly conspired;

13          And three, the defendant had reason to believe that

14   whatever benefits the defendant might get from the conspiracy

15   were probably dependent upon the success of the entire

16   venture.  It is no defense that a person's participation in a

17   conspiracy was minor or for a short period of time.

18          The Government is not required to prove that the

19   parties to or members of the agreement or conspiracy were

20   successful in achieving any or all of the objects of the

21   agreement or conspiracy.

22          The defendant is charged in Count 2 of the

23   Indictment with possession of a listed chemical, namely,

24   Pseudoephedrine, knowing or having reasonable cause to

25   believe it would be used to manufacture a controlled

1    substance, namely methamphetamine, in violation of

2    Section 841(c)(2) of Title 21 of the United States Code.

3         In order for the defendant to be found guilty of

4    that charge, the Government must prove each of the following

5    elements beyond a reasonable doubt:

6         First, the defendant knowingly possessed

7    Pseudoephedrine;

8         Second, Pseudoephedrine is a listed chemical;

9         And third, the defendant possessed it knowing or

10   having reasonable cause to believe that it would be used to

11   manufacture a controlled substance, namely methamphetamine.

12        It does not matter whether the defendant knew that

13   Pseudoephedrine was a listed chemical.  You are instructed as

14   a matter of law that Pseudoephedrine is a listed chemical,

15   and that methamphetamine is a Schedule 2 controlled

16   substance.

17        A person has possession of something if the person

18   knows of its presence and has physical control of it or knows

19   of its presence and has the power and intention to control

20   it.  More than one person can be in possession of something

21   if each knows of its presence and has the power and intention

22   to control it.

23        An act is done knowingly if a defendant is aware of

24   the act and does not act through ignorance, mistake, or

25   accident.  The Government is not required to prove that the

1    defendant knew that her acts were unlawful.  You may consider

2    evidence of a defendant's words, acts, or omissions along

3    with all of the other evidence in deciding whether a

4    defendant acted knowingly.

5          The intent of a person or the knowledge that a

6    person possesses at any given time may not ordinarily be

7    proved directly because there is no way of directly

8    scrutinizing the workings of the human mind.  In determining

9    the issue of what a person knew or what a person intended at

10   a particular time, you may consider any statements made or

11   acts done or omitted by that person and all other facts and

12   circumstances received in evidence which may aid you in your

13   determination of that person's knowledge or intent.

14         Reasonable cause to believe means that the

15   defendant subjectively knew facts that either caused her or

16   would cause a reasonable person to believe that

17   Pseudoephedrine would be used to make illegal drugs.

18         Count 2, charging illegal possession of

19   Pseudoephedrine, may be proven beyond a reasonable doubt

20   against defendant using any of three theories of liability:

21         Individual liability, conspirator liability, and

22   aider and abetter liability.  I have already discussed

23   individual liability.  Now, I will discuss co-conspirator

24   liability.

25         A conspiracy is a kind of criminal partnership, an

1    agreement between two or more persons to commit one or more

2    crimes.  The crime of conspiracy is the agreement to do

3    something unlawful.

4           Each member of the conspiracy is responsible for

5    the actions of the other conspirators performed during the

6    course and in furtherance of the conspiracy.  If one member

7    of the conspiracy commits a crime in furtherance of a

8    conspiracy, the other members have also, under the law,

9    committed that crime.

10          Before you may consider the acts of the

11   co-conspirator, you must first determine whether the acts

12   were made during the existence of and in furtherance of an

13   unlawful scheme, and whether any offense was one which could

14   reasonably have been foreseen to be necessary or a natural

15   consequence of the unlawful agreement.

16          Therefore, you may find the defendant guilty of

17   illegal possession of Pseudoephedrine as charged in Count 2

18   of the Indictment if the Government has proved each of the

19   following elements beyond a reasonable doubt:

20          One, a person named in Count 2 of the Indictment

21   committed the crime of legally possessing Pseudoephedrine as

22   alleged in that Count;

23          Two, the person was a member of the conspiracy

24   charged in Count 1 of the Indictment;

25          Three, the person committed the crime of illegally

1    possessing Pseudoephedrine in furtherance of the conspiracy;

2            Four, the defendant was a member of the same

3    conspiracy at the time the offense charged in Count 2 was

4    committed;

5            And five, the offense fell within the scope of the

6    unlawful agreement and could reasonably have been foreseen to

7    be a necessary or natural consequence of the unlawful

8    agreement.

9            Count 2, charging illegal possession of

10   Pseudoephedrine, may also be proven beyond a reasonable doubt

11   against defendant using aider and abetter liability.

12   Defendant may be found guilty of illegally possessing

13   Pseudoephedrine as charged in Count 2 even if defendant

14   personally did not commit the act or acts constituting the

15   crime but aided and abetted in its commission.  To prove

16   defendant guilty of aiding and abetting, the Government must

17   prove the following beyond a reasonable doubt:

18           First, the crime of illegally possessing

19   Pseudoephedrine was committed by someone;

20           Second, the defendant knowingly and intentionally

21   aided, counseled, commanded, or induced or procured that

22   person to commit each element of the crime of illegally

23   possessing Pseudoephedrine;

24           And third, defendant acted before the crime was

25   completed.

1          It is not enough that defendant merely associated

2    with the person committing the crime or unknowingly or

3    unintentionally did things that were helpful to that person

4    or was present at the scene of the crime.  The evidence must

5    show beyond a reasonable doubt that the defendant acted with

6    the knowledge and intention of helping that person commit the

7    crime of illegally possessing Pseudoephedrine.

8          The Government is not required to prove precisely

9    which co-conspirator actually committed the crime and which

10   co-conspirator aided and abetted in that crime.

11         The Indictment charges that the offenses alleged

12   were committed, quote, on or about, close quote, certain

13   dates.  Although it necessary for the Government to prove

14   beyond a reasonable doubt that the offenses were committed on

15   a date reasonably near the date alleged in the Indictment, it

16   is not necessary for the Government to prove that the offense

17   was committed precisely on the date charged.

18         When you begin your deliberations, you should elect

19   one member of the jury as your foreperson.  That person will

20   preside over the deliberations and speak for you here in

21   court.

22         You will then discuss the case with your fellow

23   jurors to reach agreement, if you can do so.  Your verdict,

24   whether guilty or not guilty, must be unanimous.

25         Each of you must decide the case for yourself, but

UNITED STATES DISTRICT COURT

1    you should do so only after you have considered all of the

2    evidence, discussed it fully with the other jurors, and

3    listened to the views of your fellow jurors.

4         Do not be afraid to change your opinion if the

5    discussion persuades you that you should.  But do not come to

6    a decision simply because other jurors think it is right.

7         It is important that you attempt to reach a

8    unanimous verdict, but of course, only if each of you can do

9    so after having made your own conscientious decision.  Do not

10   change an honest belief about the weight and effect of the

11   evidence simply to reach a verdict.

12        Your verdict must be based solely on the evidence

13   and on the law as I have given it to you in these

14   instructions; however, nothing that I have said or done is

15   intended to suggest that your verdict should be -- what your

16   verdict should be.  That is entirely for you to decide.

17        Some of you have taken notes during the trial.

18   Whether or not you took notes, you should rely on your own

19   memory of what was said.  Notes are only to assist your

20   memory.  You should not be overly influenced by the notes.

21        The punishment provided by law for these crime is

22   for the Court to decide.  You may not consider punishment in

23   deciding whether the Government has proven its case against

24   the defendant beyond a reasonable doubt.

25        A verdict form has been prepared for you.  After

1    you have reached a unanimous verdict on -- agreement on a

2    verdict, your foreperson will fill it in, fill in the form

3    that has been given to you, sign and date it, and advise the

4    bailiff that you are ready to return to the courtroom.

5         If it becomes necessary for your deliberations to

6    communicate with me, you may send a note through the bailiff

7    signed by your foreperson or by one or more members of the

8    jury.  No member of the jury should ever attempt to

9    communicate with me except by a signed writing.  And I will

10   respond to the jury concerning the case only in writing or

11   here in open court.

12        If you send out a question, I will consult with the

13   lawyers before answering it, which may take some time.  You

14   may continue your deliberations while waiting for the answer

15   to any question.

16        Remember that you are not to tell anyone, including

17   me, how the jury stands numerically or otherwise on the

18   question of the guilt of a defendant until after you have

19   reached a unanimous verdict or have been discharged.

20        Okay, ladies and gentlemen, we're going to take an

21   extended lunch break.  We're going to break until 1:30.  At

22   1:30 you'll hear the arguments of counsel and then the case

23   will be submitted for your deliberations.  Until the case is

24   submitted to you for your deliberations, remember not to

25   discuss the case among yourselves.  Don't form or express any

1    opinions about the case.

2              And we'll see you at 1:30 and we'll start with the

3    arguments of counsel.

4              (Open court - jury not present).

5              THE COURT:  Ms. Williams, at 1:30 you'll bring the

6    revised verdict forms?

7              MS. WILLIAMS:  Yes, Your Honor.

8              THE COURT:  If you have time before the lunch

9    break, if you can just confirm with the courtroom deputy to

10   make sure that the exhibits -- we have the right exhibits

11   going into the jury room for the deliberations.

12             MS. WILLIAMS:  Okay.

13             THE COURT:  Thank you.

14             Lunch recess from 11:39 a.m. to 1:40 p.m.)

15             (Open court - jury present).

16             THE COURT:  Good afternoon.  Government's closing

17   argument?

18             MS. WILLIAMS:  Yes, Your Honor.

19                  **GOVERNMENT'S CLOSING ARGUMENT**

20             MS. WILLIAMS:  Members of the jury, there's only

21   one issue in this case, one contested issue.  Did this

22   defendant know or, as I'll get into in just a minute, would a

23   reasonable person have known, that all of the Pseudoephedrine

24   pills purchased on these days were going to be used to make

25   methamphetamine.  There are two charges, of course, that

1   you'll have to decide, and there are elements or parts of

2   each of those charges that I'll briefly review with you in a

3   minute.

4          But it all boils down to did the defendant know,

5   should the defendant have known, would a reasonable person

6   have known?

7          And the defendant's actions, the defendant's own

8   choices, overwhelmingly answer that question again and again.

9   Yes, the defendant knew.  Yes, the defendant should have

10  known.  And yes, a reasonable person would have known.

11         Ladies and gentlemen, how many CVS stores does a

12  person have to go to to buy these pills before they know that

13  they're committing a crime?  How many times does someone have

14  to sign their name to buy these pills before they know

15  they're committing a crime?  How many times does someone have

16  to hear from a pharmacy clerk, "Are you using this to make

17  methamphetamine?", before they know they're committing a

18  crime?  How many times do they have to destroy evidence of

19  their purchase, throwing away boxes and receipts, receipts

20  that have the law right on it, before they know they're

21  committing a crime?  20 times?  50 times?  100 times?  200

22  times?

23         This defendant, in less than three months, walked

24  into CVS pharmacies over 550 times, and she bought over

25  800 boxes of Pseudoephedrine pills.  Those pills were being

1    used to make methamphetamine.  The defendant knew that.  And

2    a reasonable person would have known that.  And because of

3    that, because of the defendant's own actions and the

4    defendant's own choices, she's guilty of two crimes.

5         She's guilty of conspiring with others to possess

6    illegally the Pseudoephedrine because she knew and because

7    she had reason to believe that they would be used to make

8    methamphetamine.

9         And she's guilty of actually possessing the

10   Pseudoephedrine the day she was arrested, June 13th, because

11   she knew and because she had reason to believe that it was

12   being used to make methamphetamine.

13        First, Count 1, the conspiracy.  A drug conspiracy,

14   ladies and gentlemen, is nothing more than an agreement

15   between two or more people.  Here it's to commit a drug

16   crime.  And the Government must prove beyond a reasonable

17   doubt -- and the Government has proven beyond a reasonable

18   doubt -- that the defendant joined the agreement knowing of

19   its goal to buy Pseudoephedrine and intending to help

20   accomplish that goal.

21        Now, keep in mind the Government does not have to

22   prove that these pills were actually used to make

23   methamphetamine, just that the defendant knew or had reason

24   to believe that they would be used to make methamphetamine.

25   And in this case, there's no dispute about the drug

1    conspiracy.  There was an agreement between people to go out

2    and purchase these pills and sell them so that they would be

3    used to make methamphetamine.  That agreement is not

4    disputed.

5            The only issue in dispute is whether the defendant

6    joined that conspiracy knowing that the Pseudoephedrine would

7    be used to make methamphetamine.  Same issue I mentioned

8    earlier.

9            And the only issue in the second charge is that

10   same thing.  Okay, the second charge charges the defendant

11   with possessing Pseudoephedrine the day that she was

12   arrested, knowing or having reasonable cause to believe that

13   it would be used to make meth.

14           And there are three elements, parts to that crime,

15   that the Government must prove and has proven beyond a

16   reasonable doubt.

17           First, Pseudoephedrine is a listed chemical.

18   You've heard testimony of that.

19           Second, the defendant knowingly possessed the

20   Pseudoephedrine on that day.

21           And third, the only thing in dispute is that the

22   defendant possessed it knowing what it was going to be used

23   for.

24           In fact, you were instructed by His Honor that

25   Pseudoephedrine is a listed chemical.  That's not in dispute.

1          And it's also not in dispute that the defendant

2     knowingly possessed it then, because it wasn't a mistake.

3     She knew that it was right at her feet.

4          So essentially the defendant is claiming that she

5     possessed the Pseudoephedrine on the day of her arrest, and

6     she possessed and purchased all of that Pseudoephedrine

7     before, but she didn't know and she didn't have a reason to

8     believe that it would be used to make an illegal drug,

9     methamphetamine.  So that's the only issue.

10          Okay.  So how do we know what was in the

11     defendant's mind?  Well, as His Honor instructed you earlier,

12     there's no way to directly scrutinize the workings of a human

13     mind.  The detectives took a ton of pictures in their

14     surveillance and you saw many of those, but I don't have a

15     picture of inside the defendant's head.  I can't put that on

16     an overhead for you.  That's impossible.  So how do you know

17     what the defendant knew?  You look at the evidence of what

18     she did and you look at how she did it.

19          In this case, you've seen pictures of the defendant

20     driving her car from pharmacy to pharmacy, sometimes more

21     than 20 times a day.  You've seen pictures showing the

22     defendant driving her co-conspirators around from pharmacy to

23     pharmacy where they would also make purchases of

24     Pseudoephedrine and then get back into the defendant's car to

25     hit up the next pharmacy.  And this happened many days.  With

1    at least four different co-conspirators.

2           They spent all day in the car together, ladies and

3    gentlemen.  You can look at the MethCheck reports and see the

4    days they did this.  Sunup to sundown.  And she did this with

5    four different people.

6           She wants you to believe that they never talked

7    about this.  They spent all day doing this.  You've seen

8    pictures of the defendant walking out of pharmacies, removing

9    the pills from the boxes, tossing the receipts and the bags

10   and walking away with the pills.  And you've heard from the

11   detectives who watched the defendant and her co-conspirators

12   do this time and time again, and you've seen everything that

13   they recovered here on the table.  And you heard about her

14   demeanor during those four days that the detectives saw her.

15          The defendant wasn't scared.  She wasn't confused.

16   She wasn't just following along.  She was driving these

17   people.  She was going in herself, signing her name more than

18   600 times.  This is a picture of her walking into a pharmacy.

19   She's not confused.  She knows exactly what she's doing.

20          And you've seen this shocking MethCheck report, and

21   you'll have this back there and you can look at all of these

22   signatures over and over again.  This -- the signatures at

23   the very beginning, I submit to you, ladies and gentlemen, is

24   exactly the same as the signature on her driver's license.

25   You'll have a copy of that back there.  But, man, they did

1    this over and over again, they got tired of signing their

2    name fully, they didn't have to, and then out of the

3    pharmacy, on to the next one, making more money.

4         There are over 600 signatures here.  Over 600 times

5    the defendant had to sign her name.  And she had to do that

6    because Pseudoephedrine is regulated under federal law.  She

7    could not get this amount of Pseudoephedrine without doing

8    this.  Without going through, you know, painstakingly going

9    throughout the City of Los Angeles to all these different

10   pharmacies.

11        And you've seen pictures of what the defendant and

12   her co-conspirators possessed when she was arrested on

13   June 13th.  Right at her feet was a bag of 154 blister packs

14   of Pseudoephedrine.  At the end of the table there.  Banded

15   and ready for sale to producers of methamphetamine.

16        You heard from Special Agent Clemmer who explained

17   to you exactly how those pills are used in the process.

18   Ladies and gentlemen, this is how methamphetamine starts,

19   right here.

20        This evidence establishes firmly that the defendant

21   conspired with others to possess the Pseudoephedrine, and

22   that she possessed the Pseudoephedrine, knowing or having

23   reason to believe that it would be used to make

24   methamphetamine.  There's no other legitimate purpose for

25   that amount of Pseudoephedrine.

UNITED STATES DISTRICT COURT

1            And if that weren't enough, ladies and gentlemen,

2      you heard direct evidence from Edwin Alas, a member of this

3      very conspiracy, who told you that the defendant knew exactly

4      what she was doing, she knew what the pills were being used

5      for, and they made a lot of money doing it.

6            Now, where did they go to get that money?  They

7      were selling it at gas stations -- meeting people at gas

8      stations, meeting people in parking garages, parking lots,

9      houses.  That's a drug deal.  Those are drug transactions.

10     The defendant was there and defendant knew that.

11           Now, Edwin Alas is a criminal.  He's pled guilty to

12     the very same conspiracy that the defendant participated in.

13     And I'm not asking you to like him.  He's not a likeable guy.

14     In fact, I submit to you that the argument that he had with

15     the defendant in May that was described was an ugly incident.

16     And his actions were unacceptable.  But keep in mind the

17     Government didn't choose him as a witness because he's a good

18     person.  The Government chose him as a witness because the

19     defendant chose to do these crimes with him.  The defendant

20     chose him as her boyfriend.  And Edwin Alas chose to fess up.

21           Here's the thing about his testimony.  It's

22     supported by all of this other evidence.  He told you that

23     the defendant began buying with him in early March/late

24     February.  She started buying February 26th.

25           He told you that he signed his real name.  You'll

UNITED STATES DISTRICT COURT

1    see his name on -- I'm sorry -- you won't see his name on

2    MethCheck reports.  You have a different printout.  But he

3    admitted to you that he signed his real name.  Same name.

4    And he did that because they didn't know that this was being

5    recorded by MethCheck.  He didn't do it because he knew that

6    this was legal or because he believed that it was legal, just

7    like the defendant didn't do it because she believed it was

8    legal.  They just had no idea that MethCheck is out there.

9            And Edwin Alas didn't minimize his role.  He laid

10   it out.  And he gave up everything he knew, because he's

11   trying to help himself clearly.

12           But the defendant agreed with everything that he

13   said for the most part.  That they were buying pills

14   together.  That they spent all day together doing it.  That

15   they were visiting people like Pirulin, Elmer, Miguel in gas

16   stations and body shops.

17           The only thing that the defendant doesn't want you

18   to believe about Edwin Alas is his testimony that the

19   defendant well knew what the pills were being used for.

20   Well, she can't have it both ways.

21           And at the end of the day, members of the jury, if

22   you don't want to believe a word about Edwin Alas, fine with

23   me, just throw his testimony out the door.  What are you left

24   with?

25           All of this evidence recovered by detectives from

1    LAPD.  All of the pictures that you saw.  And the MethCheck

2    report.  None of these things have a motive or a reason to

3    lie.  These are just things.

4           Ladies and gentlemen, the defendant knew what she

5    was doing.  She knew what that agreement entailed.  She

6    joined it knowing about it and intending to help it.  And she

7    did help it because they actually possessed Pseudoephedrine

8    the day that they were arrested.  The defendant is guilty on

9    both counts.

10          And I have one more point for you.  And this is the

11   real sticking point of the case, ladies and gentlemen.

12   Because even if you believe the defendant, even if you

13   believe everything that she said to you, even if you believe

14   that she went to these pharmacies over 550 times in three and

15   a half months and she continued to buy pills that she had

16   never seen before, and that she spent all day long doing this

17   with four other guy who were doing this with her and she

18   didn't know -- even if you believe that, the evidence, as

19   applied to the law, as His Honor instructed you, still leads

20   to a guilty verdict because the defendant is guilty if she

21   knew or if she had a reason to believe.

22          And I just want to go over that last instruction.

23   Reasonable cause to believe means that the defendant knew

24   facts that either caused her to actually know or would cause

25   a reasonable person to believe that the Pseudoephedrine would

UNITED STATES DISTRICT COURT

1   was being used to make an illegal drug.  Here the drug is

2   methamphetamine.

3        So just ask yourself what facts did the defendant

4   know, even if you want to believe everything that she said

5   about what was going on in her mind.  The defendant knew that

6   she had to go to all of these stores over and over again.

7   The defendant knew that she had to do this on a daily basis

8   to get the amount of pills that she wanted.  And the

9   defendant knew that she had to sign her name every time.

10  The defendant had to deal with clerks asking what's going on,

11  threatening to call the police.  The defendant knew that she

12  had to take these pills out of the boxes and throw away the

13  boxes and the receipts.  And the defendant knew that she had

14  to drive others around to do this very same thing and that

15  they were collecting pills.  And maybe they weren't talking

16  in the car while they were spending 11 hours together.

17       And if you believe the defendant's story that when

18  she asked Edwin Alas what these pills were being used for and

19  he told her, "It's best for you not to know" -- even if you

20  believe that, what would a reasonable person believe?  If

21  you're buying all of these pills and someone who you're doing

22  it with says, "It's best that you not know."  Now, let's go

23  sell these in a parking garage.

24       And she's doing this 550 times.  The defendant knew

25  all these facts.  That's her story.  And she's guilty even

UNITED STATES DISTRICT COURT

1    under her story.

2            Because a reasonable person would have known that

3    these pills were being used to make methamphetamine.  And the

4    defendant, I submit to you, knew that these pills were being

5    used to make methamphetamine.

6            Members of the jury, you've learned that

7    Pseudoephedrine is a necessary ingredient for that drug,

8    meth.  That's how it's produced in virtually every meth lab

9    in this country.  And the evidence that you've seen and heard

10   in this trial proves that the defendant was a supplier of

11   that necessary ingredient.  The defendant knew, a reasonable

12   person would have known, so no matter how you look at it, the

13   defendant is guilty of possessing Pseudoephedrine and

14   conspiring with others to do so without a legal purpose.

15           The evidence on both of these counts is clear, as

16   is your duty of a jury, which is to take that evidence and to

17   take the law that His Honor as instructed you and to reach a

18   verdict consistent with the two of those.

19           And if you do that, ladies and gentlemen, there's

20   only one conclusion, the defendant is guilty of both charges.

21           THE COURT:  Thank you.  Defense's closing argument?

22           MR. SCROGGIE:  Thank you, Your Honor.

23                   **DEFENSE CLOSING ARGUMENT**

24           MR. SCROGGIE:  Good afternoon, ladies and

25   gentlemen.

1            I think you should disregard the testimony of Edwin

2       Alas in its entirety.  Ms. Williams says she doesn't mind if

3       you do.  And for reasons I'll explain in detail later, I

4       think that's exactly what you should do.  And if you do that

5       -- and I respectfully submit that you should -- what you're

6       left with is this lovely display on her counsel table.  And

7       that's simply not enough to convict someone.  And I'll go

8       into further detail about it later.

9            All you have left is this display, the MethCheck

10      records that basically just document this display, the map

11      that shows where this display came from, and surveillance

12      photos that show -- that were taken as this little display

13      was put together by the people in the car.

14           But before I get right into the heart of the case,

15      I want to say a couple things.  You know by now, I don't want

16      to belabor the point, that the Government has the burden of

17      proving the defendant's guilt and has a burden of proving it

18      beyond a reasonable doubt.

19           What that means -- the Court has already instructed

20      you, but what that means, and I just want to kind of

21      reiterate one sentence in the Court's instruction.  A

22      reasonable doubt is a doubt based upon reason and common

23      sense and not based purely on speculation.  It may arise from

24      a careful and impartial consideration of all the evidence or

25      from lack of evidence.

1            So that being the standard, let's get into the

2     case.  One thing, though, first.  I think you're clear, but

3     just in case, Ms. Mungia is only on trial on the charges

4     charged in the Indictment.  And what that -- and that is, of

5     course, conspiracy to possess Pseudoephedrine knowing or

6     having reasonable cause to belive it's going to be used to

7     make methamphetamine.  And possession of Pseudoephedrine,

8     knowing or having reasonable cause to believe it will be used

9     to make methamphetamine.

10            Just so you're not confused, and I'm not saying

11    that you are, what she's not charged with is violating that

12    rule that has been coming up throughout the course of the

13    trial that no one is to go buy more than 3. -- I think it's

14    3.6 grams.  And if I'm wrong, I mean, I stand corrected, but

15    I'm pretty sure it's 3.6 grams per day of Pseudoephedrine.

16            We've been hearing about this rule.  That's not

17    what she's charged with doing.  She's not charged with it.

18    And you've been instructed that if she's not charged with it,

19    you're not to deliberate on that.

20            So I'm asking you to focus on the two charges that

21    she's charged with and not anything else, not that rule or

22    not anything else that we may conjure up that might have been

23    a possibility here.

24            As to the two counts, I think it's probably best,

25    to make sure everything is clear, to address the two charges

1    in reverse order.  And the reason why is why Count 1 is the

2    conspiracy, but it's the conspiracy to violate Count 2,

3    basically.  It's an agreement to commit the crime that's

4    charged in Count 2.

5           So let me talk for a second about Count 2.

6    Possession of Pseudoephedrine, knowing or having reasonable

7    cause to believe that it will be used to make

8    methamphetamine.

9           And Ms. Williams is right that that is the real

10   only issue in this case.  So she has the burden of proving

11   beyond a reasonable doubt either that Ms. Mungia knew that

12   this Pseudoephedrine was going to be used to make

13   methamphetamine or that a reasonable person in her position

14   would have.  Which brings me to the point -- and I was going

15   to talk about it later, but perhaps it should be hit right up

16   here and now.

17          Having reasonable cause to believe.  And the

18   instruction refers to a reasonable person.  So who would that

19   reasonable person be?  When -- during jury selection, I

20   believe on four separate occasions throughout the process,

21   His Honor asked the panel whether anyone knew that

22   Pseudoephedrine could be used to make methamphetamine.  And

23   out of all those four questions, one person raised their

24   hand.  And I believe they said that they learned it from the

25   *LA Times*.

1              So who is this reasonable person?  Is it Special

2       Agent Bradley Clemmer who testified as to how methamphetamine

3       is made from Pseudoephedrine?  He seems like a reasonable

4       enough person.  Is it Jennifer Williams?  She seems like a

5       reasonable enough person.  Is it me?  I think I'm a

6       reasonable person.  No, it's not.  And why not?  It's a

7       reasonable person in the position of the defendant.  Someone

8       young, recent immigrant, little -- some formal education,

9       through the ninth grade with some difficulty -- and in the

10      position she was in with Mr. Alas with all -- with everything

11      that went on that.  With all of the choking down of being

12      able to ask any questions and all of that.  So that is the

13      standard that is to be applied here.  It's a reasonable

14      person in her position.

15             Count 2 -- I mean, Count 1, I'm sorry.  As His

16      Honor told you, the crime of conspiracy is the agreement to

17      do something unlawful.  It's not just an agreement, it's an

18      agreement to do something unlawful.  And the something

19      unlawful here is to possess Pseudoephedrine, knowing or

20      having reasonable cause to believe that it's going to be used

21      to make methamphetamine.  So which takes you right back to

22      Count 2 and everything I've just talked about.  And that's

23      why I'm telling you that I think you need to reverse the

24      order of these and look at Count 2 before you look at

25      Count 1.

UNITED STATES DISTRICT COURT

1          As to the conspiracy, the Government also has

2     elements that it has to prove to prove this illegal

3     agreement.  A plan to commit a crime.  Actually the elements

4     are, first, beginning on a date, there was an agreement

5     between two or more persons to possess the Pseudoephedrine,

6     knowing or having reasonable cause to believe, that it would

7     be used to make methamphetamine.  An agreement to do

8     something unlawful.  An unlawful plan with an intent to

9     advance or further the objective of that unlawful plan.

10          So it's not enough that she agreed to go out and

11     buy Pseudoephedrine for or with Edwin Alas.  It had to have

12     -- to be illegal, to be a part of the conspiracy, she had to

13     have been in on -- in on the conspiracy, which means she had

14     to have -- have to have had knowledge that what they were

15     doing was for the purpose of methamphetamine.  Either knew or

16     a reasonable person in her position would have known.  So the

17     knowledge requirement.  The Government has the burden on

18     that.

19          And then the jury instructions also talk about

20     three theories to prove Count 1 directly by conspiracy by

21     aiding and abetting.  Everything requires this same knowledge

22     that I'm talking about.

23          So Ms. Williams wants you to just look at this

24     evidence display and look at the driving around and all the

25     pills and just look at the numbers that we're adding up and

1    then conclude that because of all of that, this woman or

2    someone in her position would have known that this stuff was

3    used -- would be used to make methamphetamine.

4         So -- to do that, I mean, does that alone prove it?

5    No, it doesn't.  You need something else.  You need some

6    evidence that shows what she's thinking.  Was there any

7    evidence that when someone of a young age moves to the

8    United States from some third-world country such as El

9    Salvador, does Agent Clemmer give them a seminar on all of

10   our social ills in the United States and teach about the meth

11   problem and how this is working?  No.

12        Is there any evidence at all that in her three

13   years of education here, the three grades over four years,

14   that she was ever taught anything about Pseudoephedrine being

15   used to make methamphetamine?  No.  Any evidence she reads

16   the *LA Times*?  No.  Nothing.

17        So what you're left with is the testimony of Edwin

18   Alas.  And unless you believe Edwin Alas and all of this

19   testimony about how he told her, the clerks told her, she

20   knew everything, she was even going to go to Atlanta with us

21   and split the 20 grand to take a bunch of these pills down

22   there -- unless you believe him, she's not guilty of any of

23   this.

24        So I submit to you that this young, unsophisticated

25   woman with little formal education was naive.  No reasonable

1   person in her position would have known.  And that she was

2   simply used by Edwin Alas.  If Edwin didn't tell her, how

3   would she know?

4          And I respectfully submit to you that Edwin cannot

5   be believed.  You have been instructed -- well, Mr. Alas pled

6   guilty to the exact conspiracy that's charged in this case.

7   Within 30 days agreed to get back out and go out and help the

8   Government against everyone he was involved with, his

9   brother, his employees, the people he sold to and his

10  girlfriend, if we believe that she was his girlfriend.  I'm

11  not sure if she was really his girlfriend or not or whether

12  just someone he recruited that this person he will only refer

13  to as Pirulin suggested.  He recruited her.  He taught her.

14  He managed her.  And he used her.

15         The Court has instructed you that someone such as

16  Edwin who is a conspirator in a case pleads guilty, testifies

17  against the people who would be his codefendants, their

18  testimony should be viewed with extra caution over other

19  witnesses.  And that's obvious reasons.  Do you think he has

20  a motive to make sure that she goes down in this case.  Don't

21  be naive.  Did he sign a piece of paper where he promised to

22  tell the truth?  Of course, he did.  No contract with the

23  drug dealer like that is going to say whatever you want, even

24  throw in a few lies if you want.  You're not going to see

25  anything like that.  Of course he's signing to tell the

1    truth.

2         Did he tell the truth?  I don't think so.  He comes

3    in here -- you know -- I will say that he was a very

4    well-prepared witness.  We know that he was interviewed on

5    August 8th of 2008.  We knew he was interviewed on

6    February 27th of 2009.  We know that he was interviewed on

7    May 1 of 2009.  And then after those three separate

8    interviews, on the eve of trial, we know he was interviewed

9    on at least three occasions for two to three hours per time.

10   Thursday, September 24th, last week.  Friday, September 25th,

11   last Friday.  Monday, September 28th, this Monday.  Very well

12   prepared.  Very polite.  Very respectful.  Looked good.  I --

13   I submit that they cleaned him I really well.  But does that

14   mean that he's honest?  No.

15        And I'll be the first one to admit that I never got

16   him -- I cross-examined him the best way I knew how, and did

17   I get him to admit that he's lying?  Of course not.  Of

18   course not.  Every defense lawyer waits for that *Perry Mason*

19   moment where someone on the witness stand finally can't take

20   it any more, starts shaking and say, "Oh, all right, all

21   right, all right, I did everything, it was all my thing."

22   But that's on television.  That's not here.  Didn't happen

23   here.  Doesn't mean much.

24        I think you know just from his testimony, from his

25   answers to questions, that his testimony can change over

1    time.  And he -- I submit to you that he is one street wise

2    little guy.  He may not be very old, but he knows his way

3    around the street.  And he was very careful, I respectfully

4    submit to you, to not directly contradict anything he had

5    said back in 2008 or February or May of 2009.  But he did.

6         And the story kept growing and growing and growing

7    to where he never said early on, no one ever wrote down,

8    "Oh, yeah, he said that Kenia was an equal partner with him

9    and she got equal money."  He never said that early on.  And

10   when I asked him about it, he goes, "Well, I think I did in

11   one of those meetings."  Well, what, you think the DEA agent

12   who was taking notes fell asleep?  I don't think so.

13        Do you -- I mean, you can't explain that away.  He

14   can't say, "Well, yeah, I said what you said I said, but

15   that's not what I meant."  He's making it up as he goes

16   along, and he's trying to bury Kenia.

17        Now, I want to be clear that I am not even

18   suggesting that Jennifer Williams would knowingly or

19   willingly get him to come here to testify to lies.  To the

20   contrary.  I submit to you that Edwin Alas has no loyalty to

21   anybody, not Jennifer Williams, certainly not Kenia Mungia.

22   He just used her and used her up, and now, she's still just a

23   little pawn in his little game to keep his freedom.

24        And I submit to you that Jennifer wouldn't put him

25   up there and have him knowingly testify to lies, but he would

1    do it behind her back.  He's in a tough spot, ladies and

2    gentlemen.  If he admits on the stand -- if he gets caught in

3    a lie, what happens to him?  You know from his own testimony,

4    if he gets caught in a lie or if he finally says, "Okay, it

5    wasn't that way," his plea agreement is revoked.  He's pled

6    guilty, he's got a plea agreement, a cooperation plea

7    agreement, where he hopes and prays that after this trial is

8    over and after everybody else is all done and sentenced,

9    anybody he sold methamphetamine to, his employees who he had

10   buy the stuff for him and paid them daily, his brother who he

11   apparently cut in on some of the profits, when all of that is

12   said and done, he is hoping and praying that the Government

13   will come in here and say Mr. Alas did a wonderful job, he

14   helped us obtained six, seven, eight, however many

15   convictions, in a total of this many years of time.  And we

16   want him to be rewarded generously.  That's what he wants.

17   And that's what he is trying to get.

18          And I submit to you that his credibility is not

19   just questionable, but it's out the window.  He's a -- maybe

20   we can sum this up by saying you can take the gang-banger out

21   of the gang, but you can't take the gang out of the

22   gang-banger.  He wasn't willing to admit he's in this gang.

23   Why do you think he has the tattoo emblazoned across his

24   back?  Maybe he's not still in the gang, but you can't the

25   gang out of the gang-banger.  He's out for himself.  Anybody

1    else is just a pawn in his game.

2          He's got a baby.  I don't know what his

3    relationship with is with the mother of his baby.  Apparently

4    he kept a relationship with her while he was courting

5    Ms. Mungia and had her out there driving him around and

6    buying all these pills.  I don't know what his relationship

7    is with her, but I'll tell you one thing.  He does want to

8    stay around.  I assume he wants to see his baby.  And he'll

9    do whatever it takes to make sure that happens as soon as

10   possible.

11         So I submit to you that his testimony that she's a

12   partner with him, false.  His testimony that she knew about

13   the money, she got a chunk of the money, false.  His

14   testimony that he told her a clerk -- he overheard a clerk

15   tell her this is used to make methamphetamine, false.  His

16   testimony that she comes to him and says is this really used

17   to make methamphetamine, false.  You can't believe a word the

18   guy says.

19         Can you think of one reason why a clerk at CVS, who

20   has this recordkeeping requirement to keep these pills out of

21   the hands of methamphetamine cooks, would ask a person or

22   tell -- not ask, but tell, "You know, these pills you're

23   buying are used to make methamphetamine"?  That didn't

24   happen.  And if it would've, do you think she would continue

25   driving around and using her true identification to buy this

1    stuff for the ensuing months?  I don't think so.

2              Did she know about MethCheck?  No.

3              Did she know they were recording her identification

4    information and her signature every time she bought?  You bet

5    she did.  It was being recorded and she knew it.

6              I can't speak for what Mr. Alas is thinking or

7    anybody else, but I submit to you that if she would have

8    known what was really going on, it wouldn't have happened.

9              So I think you all have a reasonable doubt as to

10   the testimony of Edwin Alas.  And I submit to you that doubt

11   is very reasonable.  I submit to you that that doubt is not

12   speculation, as the Jury Instructions set out, as the Court

13   red to you.  It's very real.  Without the testimony of Edwin

14   Alas, there's nothing, nothing, to show that she knew --

15   there's nothing to show that a reasonable person in her

16   position who got slapped around when she got argumentative or

17   asked too many questions or anything like that, no evidence

18   that anyone in her position would have known.

19             She came over here from El Salvador in 2000.

20   Nobody ever taught her about what this stuff's used for.  She

21   testified herself that she became -- she started to wonder

22   what is this all about.  She never got any straight answers.

23   But that doesn't mean -- the question this is -- I think her

24   words were, "This is ridiculous.  I'm tired of this."  That

25   does not convert to this is used to make drugs, mainly

1    methamphetamine like charged in the Indictment.  It doesn't

2    convert.  It doesn't convert.

3           I know you have a doubt -- I know you have a doubt

4    about that Edwin Alas was up there, and you should.  Your

5    doubt is reasonable.  Your doubt is not based on speculation.

6    It's based on your own common sense, as you're required to

7    bring here.  And I'm going to ask you to go back in the jury

8    room and find her not guilty of both the Counts because of

9    that.

10          Before I do, just a couple little things.  You are

11   all -- you all took an oath to apply your own conscientious

12   decision.  Your own independent deliberation in the case.

13   And what that means -- what that means to me is you're 12

14   generals, you're going to go back there and pick a

15   foreperson.  That doesn't mean you have one General and 11

16   Privates.  You're 12 Generals.  You're the Joint Chiefs of

17   Staff.  You each are to deliberate the case.  And as the

18   Court already told you, you're not to change the way you

19   vote, the way you conclude the case, unless it is based on

20   serious deliberations and you're genuinely convinced that you

21   should.  And that's what I ask you to do.  I want you to all

22   be Generals.  Be the Joint Chiefs of Staff.  Vote your

23   individual conscience and come back with a verdict of not

24   guilty on both of the counts.

25          This is my last time to talk to you.  Ms. Williams

UNITED STATES DISTRICT COURT

1    gets to stand up again, and I'll be sitting over there -- I

2    tell my wife that there are three closing arguments in the

3    trial.  There's the one you plan to give.  There's the one

4    you give.  And then there's the one you wish you would have

5    given after you sit down.  I'll be sitting there listening to

6    her talk -- and I don't know how long she's going to talk --

7    but I know that I'll wish I had another chance to get up and

8    talk to you again, but I don't.

9            I want to believe that I've done the very best job

10   that I can do to defend Kenia Mungia in this case.  I hope

11   that I have.  But now I'm finished.  I hand the case to you.

12   And I simply ask one thing of you.  And I want you to

13   approach your job in this case just as seriously as I have

14   tried to approach my job in defending her.

15           Thank you very much.

16           THE COURT:  Thank you.

17           MS. WILLIAMS:  Ladies and gentlemen, this is Kenia

18   Mungia's trial.  This trial is not about Edwin Alas.  So I

19   ask you to look at what this defendant did.  I ask you to

20   look at what she bought, how many times, and how she did it.

21           And I ask you to look at that because there's no

22   escaping these physical things.  And the MethCheck report

23   that I know I've showed you so many times, but it's just --

24   there's no getting around this.  Those are facts, and those

25   facts are undisputed.

UNITED STATES DISTRICT COURT

1          Now, there are distractions from those facts, and

2     that's what the defense wants Edwin Alas to -- they want you

3     to think about what a terrible person Alas is, what he did,

4     how he came to the government after he was arrested and

5     provided a lot of information, which I'm not sure that that's

6     a bad thing.

7          But Edwin Alas is not a good person.  We know that.

8     You can disregard his testimony entirely.  And all of this is

9     still before you.  And all the discussion about Edwin Alas is

10    just to keep you looking over here and not to keep you

11    looking here.

12         Edwin Alas did come in to the Government after he

13    was arrested, about a month or two after he was arrested, and

14    he provided a lot of information.  But as you heard, the

15    defendant was not the focus of those conversations at that

16    those times.  The Government had an interest in learning the

17    entire scheme and where these pills were going.  And you

18    heard that he gave all of that information then.  He gave

19    information about Pirulin and Israel and Miguel, Fantasma.

20         And you heard that he has a plea agreement.  And

21    you heard that if he tells a lie at any point, that plea

22    agreement goes away.  And he has been meeting with the

23    Government to provide all of this information since August of

24    last year.  And he still has his plea agreement.

25         I want to go over one of the slides that I showed

UNITED STATES DISTRICT COURT

1    you, and that's because I want you to be sure to follow the

2    law as the Judge instructs you -- as the Judge has instructed

3    you.  And not as the defendant wants you to be instructed,

4    because reasonable cause to believe means that the defendant

5    knew facts that either caused her or would have caused a

6    reasonable person to know what the drugs were being used for.

7           So did the defendant know facts that would cause a

8    reasonable person to believe that these pills were being used

9    to make illegal drugs?  The defendant knew she had to go to

10   550 stores to get them.  The defendant knew that she had to

11   do it because it's in violation of federal law.  The

12   defendant knew that this was not normal.  That was her word.

13   Defendant knew this was ridiculous.  That was her word.

14          Even under her story, if Edwin Alas had said, "It's

15   best for you not to know," these are all of the facts that

16   the defendant knew.

17          And she wants you to look at her exact position in

18   life.  That can't be the case, ladies and gentlemen.

19   Otherwise, we would have had to start from her birth up until

20   now and everything she's been through.  And I'm not saying

21   it's been easy for her.  But she chose to do these things.

22   She's from El Salvador and maybe she's not that educated.

23   But she's from El Salvador, not the moon.  Methamphetamine

24   exists in El Salvador.

25          You have to look at her efforts to conceal all of

1    this.  Throwing this stuff away.  Avoiding the regulations.

2    Packaging it up.  Driving hundreds of times.  And 800 boxes

3    of Pseudoephedrine.  The defendant made these choices.  She

4    did these things.  And because of that, she's guilty of both

5    charges.

6              Now, one more thing before I conclude.  And that is

7    the burden that the Government has.  And that is the burden

8    to prove beyond a reasonable doubt that the defendant did

9    these things.  And the Government embraces that burden.  And

10   I ask you to hold me to that burden.  And that is proving

11   beyond a reasonable doubt.

12             And just as Mr. Scroggie advised, that doubt -- in

13   order for you to find her not guilty, that doubt has to be

14   based on reason and common sense.

15             Ladies and gentlemen, if you use your common sense,

16   what is this stuff being used for?  So I ask you when you

17   deliberate to not leave your common sense behind.  Take it

18   with you.  And take it with you when evaluating what a

19   reasonable person would have known about all of these

20   actions.  And what a reasonable person would have known about

21   these pills.  And what the defendant knew.  Both of those

22   answers are these pills were being used to make

23   methamphetamine.

24             Because of that, the defendant is guilty of both

25   charges.  And I ask you to find for guilty of both charges.


UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Would the clerk swear in the bailiff,
 2    please.
 3              THE CLERK:  Would you raise your right hand and
 4    state your name for the record?
 5              THE BAILIFF:  Jerry Melendez.
 6                 JERRY MELENDEZ, BALIFF, sworn
 7              You may take the jurors to the jury room.
 8              (Open court - jury not present).
 9              THE COURT:  Ms. Williams, do you have the proposed
10    verdict forms?
11              MS. WILLIAMS:  Yes, Your Honor.
12              MR. MICHAELS:  May I approach?
13              THE COURT:  Mr. Scroggie, have you had a chance to
14    review these?
15              MR. SCROGGIE:  I have seen them, Your Honor.
16              THE COURT:  All right, any objections to the
17    proposed verdict forms?
18              MR. SCROGGIE:  No objection.
19              THE COURT:  Okay.  You may approach.  Thank you.
20              (Proceedings concluded at 2:35 p.m.)
21                            CERTIFICATE
22    I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
23    TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN
24    THE ABOVE MATTER.
25    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE
```

UNITED STATES DISTRICT COURT

1    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

2    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

3

4    _____          10/20/2010

5    MIRIAM V. BAIRD                           DATE
     OFFICIAL REPORTER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT